Judge Prager-Sim, can you hear me okay? Uh, let me see. Uh, you're, uh, Tracy? That's correct, Your Honor. I said Tassadio. Correct, Tracy Tassadio on behalf of Petitioner. I said God. That is right. All right. Not many people know that. Well, you know, you grew up in East L.A., you know these things. Go ahead. Okay. May it please the Court. The District Court has already found in this case the defense counsel performed deficiently under Strickland in failing to realize the availability of the diminished capacity defense based on a theory of mental impairment. The key issue for this Court to resolve is the prejudice stemming from that mistake of law. The review of that question is de novo and EDPA does not apply. There are a few key factors relevant to your prejudice analysis. First being that the jury heard evidence of Mr. Hernandez's admission to committing two horrible crimes. Nevertheless, it took the jury more than two full days to decide his guilt. How long was the trial? I think just about a week, Your Honor. You have to speak into the microphone. I'm sorry, Your Honor. I believe the trial was about a week. And it was only about one day for the first case, wasn't it, and then another day for the second case. I'm not certain what Your Honor is referencing in terms of first case and second case. Well, there were two murders. It was all tried together, Your Honor? Yes, but I mean the jury. The jury, I think, decided the first issue after one day and the second after two. I did not see that in the record. It appeared to me that the decisions came down at the same time. No, it was issued at the same time. Right. Well, it's not a terribly important point, so we can check it anyway. Okay. I'm happy to look at that, Your Honor. Intent was really the issue that the jury had to wrestle with during its deliberations. And on that issue, what it had before it was evidence that Mr. Hernandez was perhaps a little drunk, at least on the night of the Kathy Ryan murder, and that an equivocal testimony by an expert stating that an alcoholic like Mr. Hernandez may or may not have been able to form the requisite intent. The jury did not hear any evidence that Mr. Hernandez was mentally ill. They did not hear that he had bipolar disorder causing hypomania. They did not hear of his chronic dissociation or of his extensive brain damage. These conditions, along with his alcohol and drug impairment and his substance abuse, all impacted his executive functioning, impulse control, reality testing, his ability to make rational judgments, and to accurately interpret basic social cues and emotional communications, while also increasing his aggressiveness, hypersexuality, and rage. The evidence of the crimes and of the experts at the time of trial was that Mr. Hernandez was out of control. What was lacking was any explanation for why. A broader understanding of Mr. Hernandez's mental impairments, together with the background of child abuse and neglect, was that he was being raised by a violently schizophrenic woman who chased him with a knife, with a baseball bat, who had sexually violent delusions, who disciplined him by tying him up to chairs or sitting on him. And gave him enemas. Correct. But, you know, there's one question that I'd like to ask. Why didn't this matter proceed to sentencing? I'm not sure I understand the question. Why doesn't the matter proceed to sentencing? Yes. I mean, the judge who handled this case, he determined that your client has to be, he reversed on the sentencing, didn't he? That is correct, Your Honor. All right. So then why didn't it go back? Why didn't it stay with him? We're talking about Judge Lu, right? Yes, Your Honor. Yeah, who's a pretty stern judge. I've known him a long time. Now, he reversed on the sentencing. So how did it get up here? Why did it come up here for a hearing, then, on his state of mind at the time of the commission of these horrific crimes? Your Honor, Mr. Hernandez appealed the denial of guilt-phase relief. And the reason this evidence is relevant to guilt-phase relief is that at the time of the crimes, diminished capacity was an available defense that would have permitted the jury to return a verdict of second-degree murder. Okay. So let me ask you this. Is the death penalty still on the table? It is not, Your Honor. Well, why don't you tell us that? It is not on the table. Correct, Your Honor. Whatever decision that we make today, one way or the other, he won't be executed. That is your client. That is true, Your Honor. Yeah, well, you know, I wondered about this for a long, long time and tried to figure it out. You know, this is a huge record, and I spent a lot of time on it. And I continue to wonder, is the death penalty still on the table? We didn't get it from the Attorney General's office, and we didn't get it from you. I mean, that's kind of an important piece of information. Can I just deviate from the normal procedure and ask the State here, do you agree that there is no longer a possibility of a death penalty in this case? Good morning, Your Honor. Do you want it so they can hear you? I guess I'll ask the Attorney General if he agrees that there is no longer a possibility of a death penalty being imposed in this case. Good morning, Your Honor's Deputy Attorney General, Gary Lieberman, for responding. Yeah, will you speak up, please? Gary Lieberman. Speak into the microphone. I'm sorry. Yeah. Gary Lieberman for responding. No, the death penalty is still a possibility in this case. If this Court affirms the guilt phase of the first-degree special circumstance findings, then Mr. Hernandez is entitled to a new penalty trial or to be resentenced to life without parole. So if the first-degree murder convictions are upheld, then the matter would go back to the District Attorney's office to decide whether to retry the penalty phase or to resentence Mr. Hernandez to life without parole. So it is still on the table. Wait, let me explain that to me again, because Judge Liu vacated the death penalty and the State didn't appeal it. That's correct. Judge Liu vacated the death penalty with directions that the State either grant within 120 days, and that deadline has been stayed pending the outcome of this appeal. But Judge Liu's judgment states that, yes, the current judgment of death is vacated based on ineffective assistance of counsel and the juror misconduct issue. It's because the deadline has been stayed. Yes. Judge Liu stayed the deadline to retry the penalty phase pending the outcome of Mr. Hernandez's appeal of the denial of habeas relief as to guilt. So where, Mr. Casadillo, did you get the idea that the death penalty was off? Okay, thank you, Counselor. Off the table, so to speak. Tracy Casadillo for Petitioner again. Your Honor, I think I might have misunderstood the import of your question. What was hard to misunderstand about the import of my question? I didn't realize that it related to what could happen after this proceeding. Oh, sure. So after this proceeding. When I say, is the death penalty still on the table, you said no. You know, and the death penalty is on the table. Yes, Your Honor. If you go ahead with this appeal and you were the one that took the appeal, the defendant, lawyer, then the death penalty apparently is on the table. Well, as I understand it, if you had not appealed, the state would then have gone back to the state court if it wanted to. If it wanted to, it could have taken Judge Liu's case back to the state court and sought the reimposition of the death penalty. Yes, and they certainly could still do that after these proceedings. I think the question is whether or not the factual findings necessary for the special circumstances and for the first-degree murder conviction would also be on the table in such a case. Well, and then if it came back to Judge – then it would come back again to Judge Liu. Eventually, if the California Supreme Court didn't grant habeas relief on its own, yes, that would be true. It would come back to him. And he's already made a decision on the death penalty. Well, then, except the second time around, presumably the mitigation evidence would – I'm not talking about the second time around. I'm talking about Judge Liu vacated the death penalty, right? And then the defendant appealed the guilt phase to our court. That's where we are now. It's taken a long time to get here. And so the way I understand it now, let's assume that we determined that the guilt phase of the trial was defective. And we reversed on that. And then the death penalty apparently is back on the table. Well, it – But anyway, I wondered about that. Well, let me answer that question directly, Your Honor. If you reversed the district court on the issue of the guilt phase, in that case, on a retrial, the DA would have to retry both the guilt and penalty phases. And a jury would first have to find the facts necessary for first-degree murder before the death penalty would be back on the table. Yes, that's apparent. There are two questions this leads to. One is whether we have the authority not to decide this case at this point. Sometimes we have had cases in which we didn't hear the appeal until the entire case was resolved, and it's not really resolved as to the penalty phase. I'm not suggesting that we can do that, but it's a procedural question. In fact, the last time we had that question, the plaintiff, or I guess the defendant, who had received the death penalty, only wanted to challenge the conviction. And he didn't want to challenge the death penalty if we upheld the conviction. We managed somehow, despite that, to set aside the penalty but not the conviction. But it took a long time, went back and forth, until we had both issues fully before us. So there is – I'm saying this because you may both want to consider the effect of what you might gain if you won or gain if you lost. It may be there's a possibility procedurally that we would not have to resolve this question until the entire case was finally resolved. But secondly, you may want to consider – and I don't want – you may want to consider whether there isn't a practical resolution to this case that could be arrived at through mediation. We have successfully mediated at least one death penalty case in our mediation section. And you both have considerable risks in this case, no matter which way it comes out. Would you be willing to consider, before we issue a decision, mediating this case before our mediation department? Yes, Your Honor. Okay. Thank you. Can I get you to address the merits of the uncertified issue in terms of prejudice? I mean, you'd have to not only show that there's a conceivable chance that the verdict will be different, but that there's – Excuse me. Have you spoken to Mr. Lieberman about this, about working out a settlement in this case where your client is spared the death penalty? I believe there have been some discussions. Mr. Lieberman might be able to speak to those more directly. Well, we'll ask him when he comes up with how he feels about the possibility of mediation, whether he would have any objections. Well, I don't know that you'd even need mediation. Maybe they can make a deal today. Well, one way or another, that'll be – they can always make a deal if they want, without any help. Well, they don't talk to each other, and they make assumptions. And so we've got Pasadena, house of God, and we've got Lieberman that means that he loves everyone. So we've got good karma here. But I want to give you a chance to address the merits and Judge Liu's reasoning as to why he found that there was no prejudice in this case. How do you get past the detailed confession that Mr. Hernandez provided, in which I think that reasonable inferences can be drawn that there was an intent to rape? Your Honor, unguided by any evidence of Mr. Hernandez's background, I think that's certainly the case, and I think we can all agree that's probably how the jury viewed it. The post-conviction evidence suggests that Mr. Hernandez lacked the ability to control his impulses, was chronically dissociating at the moment in time. But the question isn't whether he had the capacity to control it. It's whether he conformed the requisite intent that's necessary. So there were felony murder theory, and also there was a premeditated theory. And so I take it from Judge Liu's analysis that he thought that the evidence was sufficient on both theories, such that even if all of the evidence regarding mental illness had been introduced in support of diminished capacity, the jury could still reasonably find that he had the requisite intent to support those theories. There is direct evidence on the question of Mr. Hernandez's ability to form that intent. You're correct, Your Honor, that there's also evidence supporting a finding of intent. And there have been many such cases, both in this court and in the California courts, where the evidence is controverted on both sides. And nevertheless, and I would point this court to Jennings v. Woodford in particular, this court has determined that in that case that there was enough evidence of diminished capacity that there was a reasonable probability that the jury might have come to a different conclusion. Despite strong evidence on the other side, and the California courts have come to similar conclusions. Here, what we have is expert opinions that Mr. Hernandez's brain damage was such that it interfered with his ability to accurately interpret facial expressions, social cues, emotional communications. These are the kinds of things that might have interfered with his ability to make rational judgments during the course of the conduct. Do you have a case where the facts are fairly similar, where the evidence of intent actually comes from the defendant's own admissions? There are several cases with admissions, and particularly in the state courts, Your Honor. I think I'm thinking of People v. Bassett, where there's not only defendant's admissions to numerous people, there's also a list of plans that conform with the crime that he created a week and a half prior. In the diminished capacity era, premeditation and deliberation were viewed as separate from the intent to kill, and you had to find both separately. Malice was a distinct element of proof, and it could not be implied by the evidence of the intent to kill, or even by premeditation and deliberation. It required that the defendant was aware of the duty imposed not to commit the act, and acted despite that awareness. I guess I'm thinking more in terms of the evidence of the rape. There were so many details in his admissions indicating an awareness that he was basically forcing the victims. On felony murder, if you take defendant's statements, particularly with victim Miss Ryan indicating that he was going to get some tonight, and his sexual harassment of her, some evidence that she was forcibly removed from her home. In the face of that evidence, I'm wondering what your best argument is in terms of why you think Judge Liu's analysis was an error. Two things, Your Honor. In terms of the statements, Dr. Lewis has opined for us that his conduct at the pizza parlor when he's making that statement is very much synonymous with the symptoms of hypomania and bipolar disorder. It would have been enough to the jury to answer the question, could he have controlled his impulse to make those statements and to enter into that conduct in that state of mind where his thoughts are pressured, he's feeling very sexual, he has a limited ability to understand how other people are feeling about his actions. The second thing is going back to Dr. Clausen's testimony regarding the statements. She suggested the evidence is that Mr. Hernandez is not actually remembering things. Sometimes he is piecing together the pieces of the puzzle that he has been provided by news accounts and by his five hours of interviews with the police. And so sometimes he's saying things like, I guess I did that, or I probably did that. And there are also pieces of the puzzle that he just simply can't account for and doesn't seem to remember at all. And all these things together suggest that he was dissociating at the time. He didn't have executive control over his actions regardless of how intentional they seemed. And that his statement is not really a product of recall but just of trying to figure out what happened. So I think those are the things that the jury would have had to weigh. Keeping in mind that every reasonable doubt needed to be resolved in Mr. Hernandez's favor and that this was not the kind of affirmative defense that had a burden of proof attached to it. It was any degree of evidence that caused the jury to have a reasonable doubt that Mr. Hernandez was capable of forming the intent. And capacity was really the only question the jury had to answer. It didn't have to go to whether Mr. Hernandez actually had the intent. It was just a capacity question. And if they found that the capacity was diminished, they were instructed that that supported the reasonable doubt on the elements of the mental state. Your Honor, I see I have seven minutes left. I would like to reserve some time for rebuttal, but of course, if you have additional questions. Why don't you, because I think that's going to be fine. Thank you, Your Honor. Good morning again, Your Honor's Deputy Attorney General, Gary Lieberman, for responding. Mr. Hernandez's statement to the police was not indicative of someone trying to figure out what he had done. Mr. Hernandez provided a detailed and coherent account to the police. He told the police regarding the killing of Edna Bristol that he was drunk. He explained his mental state, that he was mad at myself and everything, frustrated. That's why I went looking for this queer to even bond. Could you speak a little louder, Mr. Lieberman, please?  All right. What I was saying was that Mr. Hernandez's statement to the police was not indicative of someone who was trying to figure out what he had done, as Mr. Hernandez's counsel posits. Mr. Hernandez gave a detailed and coherent statement to the police about everything that had occurred. He told the police that he was drunk on the night of the Bristol killing. He told the police about his mindset. Well, didn't he do this after he'd been interrogated for a period of time, off the record? He had been interrogated or questioned off the record before the taped interview, but there's no indication that… Was it about five hours? I don't recall. It was five hours. So, you know, you've got a guy that's got some serious mental problems, and he's spoken to for a long period of time. And then when everything is all lined up or whatever, then they go on the record. So you wonder, why don't they go on the record to begin with? I can't speak to that, Your Honor. Well, you know… There's no evidence that Mr. Hernandez was fed any information. Why do you think they were off the record for five hours? I don't know that it was five hours, but regardless, there's no evidence that Mr. Hernandez was fed any information about what to say. In fact, on the record, Mr. Hernandez himself confirmed that he did not see pictures of Kathy Ryan's body before he described the tic-tac-toe marks that he etched in her chest with a piece of glass. So Mr. Hernandez confirmed at least that much, that that is something that is coming from his independent recollection. Regardless, it is not uncommon for the police to talk to a suspect, whether it's advisable or not, before going on record with a tape-recorded interview. But the important point is that there's no evidence… This is 30 years ago, and the practices may have improved since then. 30 years ago, that may not have been an unusual practice. Perhaps, Your Honor, but I think that it's just mere speculation that Mr. Hernandez was fed any information by the police. There is no evidence of that. Well, there's no evidence because we don't know what happened during that five-hour period. But if there's no evidence of that, then the court can't use the lack of evidence in order to find prejudice. There was evidence that we could have had had it been recorded from the beginning. But, you know, that's neither here nor there right now. And, you know, the question that basically, I think, comes down to what do you make of details of confession that you argue shows that he really did know what he was doing and had an intent, and which a jury could draw that conclusion and might well draw that conclusion. And on the other hand, you match that against the testimony of the four experts who testified to the contrary, that despite the fact that that appears, as you would describe it, to show his intent, the four experts tell the jury that that doesn't show intent and here's why and here's what's wrong with him. Then we have to make the somewhat artificial decision of would that, is there a reasonable probability that having heard the arguments as to why the confession is so detailed and factual that it demonstrates intent, is the jurors belief in that, is one out of twelve jurors belief in that, shaken by the testimony of the four experts to the contrary? And is there a reasonable probability that one juror at least would have come to a different result? It's not exactly an answer that you can give objectively. It really depends on who's on the jury, what do they think. Would the weight of the four expert witnesses raise a reasonable probability that a juror would come to a different result? Or is the evidence of the confession so strong that a juror is not likely to come to that result? How do you answer that question? I would answer it in the way that Your Honor kind of put it. Why don't we just pause, throw in the fact that the state's expert was incompetent. Let's put that in there too. That's why I left that out of the equation. The evidence that Mr. Hernandez had the intent, had the capability to intend to have sex with somebody against her will and to kill somebody was overwhelming. Not only was there the incredibly detailed confession, which, by the way, there's no indication that Mr. Hernandez's memory is faulty. There's no indication that Mr. Hernandez's statement to the police doesn't match up with the crime facts. But what struck me as the most compelling evidence of Mr. Hernandez's capacity to function was the steps that he took after killing Kathy Ryan. Mr. Hernandez thought, well, I can't leave Kathy Ryan at the same place where I left Edna Bristol because, well, first of all, if I go back there, maybe the police are waiting for me. And also, he had the presence of mind to try to make Kathy Ryan's body look different from that of Edna Bristol so that the police wouldn't so easily connect the two cases. This shows a functioning, calculating individual trying to cover up his crime. That is completely inconsistent with somebody whose executive functioning is substantially impaired. And regardless of what a psychologist or psychiatrist may come up with, you just can't overcome the actual facts of what occurred. Well, you've also got the similarity of the crimes and the proximity between the two murders just days apart. Yes, Your Honor. It's remarkable. Certainly, killing two people in the same way can hardly be reconciled with an accident. I don't understand why, if somebody had these mental ailments that the four doctors claim, why he would only do this thing once rather than twice? Well, I think the issue is whether, well, first of all, I think Mr. Hernandez explains why he did it, which shows that he had the capacity to form the requisite intent. With regard to Edna Bristol, Mr. Hernandez, as he stated in his statement, was looking for somebody to hurt that night. This bespeaks intentional conduct. And as Judge Nguyen referenced, Mr. Hernandez's statements at the pizza parlor prior to Kathy Ryan's murder, he's going to, quote, get some. That's a quote from Mr. Hernandez to his friend Chris Jackson. Regardless of what Kathy Ryan does. Well, I mean, that just shows the guy's a psychopath, you know. Even when he tried to make the two crimes look like there was some difference, he certainly ended up so that it wouldn't take much thinking to come to the conclusion that they were committed by the same person. So, you know, one of our basic jobs is to determine whether someone got a fair trial or not. And here you have these horrendous crimes, and the state put, I guess, appointments, because there was a problem with the conflict in the public defender's office. They appoint a person who never, as far as I can recall on the record, has never been really involved in a death penalty matter before. And here you have two murders, horrific murders, all kinds of mental issues that seem fairly apparent. Well, Your Honor, I think that while certainly no one would dispute that Mr. Hernandez had emotional problems, it doesn't mean that he lacked the basic capacity to form the intent to kill or to form the intent to have sex with somebody against their will. That doesn't seem to be a very high level of thought process to come to those intents. But as far as what the jury heard, the jury did hear evidence that Mr. Hernandez was impaired at the time of the killing. There was the testimony from Dr. Reyes about Mr. Hernandez's alcoholism and the effects that it caused, and that Mr. Hernandez was— You know, but that's really not much help. The lawyer said he thought the only defense was alcoholism, and that's all that diminished capacity meant. He wasn't trying to show anything about his mental impairment, like a brain disease or any kind of mental illness. He only used the doctor to try to show that it was a result of alcoholism. Right, and the effect that the alcoholism allegedly would have had on Mr. Hernandez's state of mind. You know, I have problems understanding this whole idea of what mental conditions, what mental ailments might have been sufficient to provide a diminished capacity defense. Judge Gregersen mentioned that the guy has psychological problems, that he may be a sociopath. He probably is. He has some of these mental difficulties, whatever they are. Brain damage. To what extent do those things constitute, negate specific intent?  None of the experts who examined Mr. Hernandez at the time leading up to trial found that Mr. Hernandez was psychotic, that he had lost touch with reality. Basically, the experts actually backed up the defense that Mr. Hernandez's trial counsel raised, was that Mr. Hernandez, his judgment would have been impaired by alcohol at the time. Prior to trial, Mr. Hernandez was evaluated by four mental health experts. There is no issue as to these experts' qualifications. Each expert personally evaluated Mr. Hernandez and reviewed various material, and they were given no limitations on their examination of Mr. Hernandez. Well, the first one was Dr. Maloney, who made a preliminary report that suggested some potentially serious psychological problems, and that the test neither ruled out nor suggested organic brain dysfunction, and that a likely schizomanic episode had occurred. And then he says this is just preliminary because they haven't really been able to make a complete report. I don't know that that helps you or the other side, but certainly he says that it doesn't rule out organic brain dysfunction. Your Honor, I'm sorry, I didn't mean to interrupt. Go ahead. I would imagine that Dr. Maloney closes every one of his reports with that closing paragraph. But what Dr. Maloney states in closing in his report is he does say the present report is a preliminary summary of my findings, and if more documents become available, I would be glad to review them and provide any addendum report that might be indicated. If more documents become available. Dr. Maloney is not requesting any specific documents. Dr. Maloney is not telling the lawyers, I need more information in order to reach a... But he says that the tests that they have already done don't rule out organic brain dysfunction. That is correct. If somebody did an organic brain dysfunction test, he'd consider that. He also didn't have any of the sociological information that you need. I don't think his report gets you very far. I think maybe that one benefits your opponents more than that. Your Honor, I would disagree because while Dr. Maloney, what Dr. Maloney's report states is, while present test results did not rule out a possible organic brain dysfunction, they certainly were not suggestive of such a disorder. That is not a recommendation that counsel obtain neurological testing. And Dr. Maloney also concludes that there was no suggestion of any specific cognitive, intellectual, or perceptual deficit. Hernandez did not manifest any of the primary signs of a major condition such as psychosis. What does it mean a likely schizomanic episode has occurred? I don't recall exactly what was meant by that, but the bottom line conclusion that Dr. Maloney renders is that there's no psychosis. Dr. Maloney, isn't that the same doctor who later on in habeas proceedings, he examined him again and updated that, right? Indicating that had he had the family history, he might have diagnosed him with bipolar disorder. Well, first of all, your Honor is referring to a declaration that was submitted by appellant's counsel that has since been withdrawn. That declaration was never before the district court at the time the district court made its decision. It was a subsequent declaration by Dr. Maloney, yes, in connection with the habeas proceedings in 2003. And prior to the district court's decision, years prior, I believe, that declaration was withdrawn by Mr. Hernandez's counsel and it was stricken. So first of all, that declaration is not properly considered. And in fact, Mr. Hernandez has since filed a notice of errata to his pleadings withdrawing that declaration. But since the court has brought it up, it actually was something I wanted to cite. But then in being very curious as to why the district court didn't even mention it, I looked at Pacer and lo and behold, it was withdrawn. I would have cited Dr. Maloney's subsequent declaration myself because Dr. Maloney never says that he would change his opinion. He says, oh, well, the totality of the evidence, I'm referring to paragraph 9, would have required me to further explore and reconsider my opinion. He talks about possible episodes of dissociation and certain evidence could raise concern. Dr. Maloney, after getting whatever additional information was provided to him, does not say that he would change his opinion. I think that is huge. But I think the defendant's best argument really comes from the experts who would have rendered an opinion that he was in this dissociative state and so the capacity to form the specific intent to either the premeditation required for first-degree murder or the intent to rape is somehow diminished. And then the jury would then have that, as Judge Reinhart pointed out, and weigh it against the detailed confession, what other corroborative evidence the prosecution is able to provide at that point. But an attorney, what Your Honor is suggesting, is that an attorney has to go out shopping for additional experts. He has to know what he's looking for. I mean, this was an attorney who didn't even know that there was a defense. Well, Your Honor, first of all, I find that incredibly hard. I know that Charles Downing did say that in his deposition 18 years after the fact. You know, in looking at his deposition, I found him to be a very thoughtful, intelligent guy. I find it incredibly hard to believe that that is actually the truth and, in fact, that basically this is Mr. Downing, who is ill. I think he's since passed away of cancer. You know, basically falling on his sword at every opportunity and it's clear. You're saying that Downing was a liar? Is that what you're saying? I'm saying that what he's saying in his deposition 18 years after the fact with a faulty memory and perhaps being overly critical of his own performance after the adverse results doesn't match up with the underlying record. If Charles Downing remarkably did not know that mental illness could be used in support of a diminished capacity defense, why is he talking to Dr. Gersh, his psychologist, about diminished capacity? He specifically points out to Dr. Gersh, you should know, that diminished capacity was a defense at the time of these crimes. Of course Mr. Downing knows that something Dr. Gersh could say might inform the decision of diminished capacity. What is also remarkable is that it was Charles Downing who submitted the jury instruction, the request of the instruction on diminished capacity, and the instruction itself specifically says, this is page 575 of the excerpt of the record, the diminished capacity instruction requested by the defense specifically says that the jury must determine if the defendant was suffering from some abnormal mental or physical condition, however caused, which prevented him from forming the specific intent. So what Mr. Downing may say many years after the fact with a faulty memory and perhaps a guilty conscience doesn't match up to the underlying record. It was not counsel's obligation to go out, and I don't know how long these habeas proceedings have been pending, to go out and scour the country for experts who would be able to say what the defense now is able to say. The defense had four qualified experts at the time of trial. Mr. Hernandez has said nothing to impugn their qualifications. They were given no limitation whatsoever on the evaluation that they were to perform on Mr. Hernandez. Well, if the district court found that Dr. Gersh told Downing that there was an indication of an organic neurological basis for Hernandez's behavior. Yes, but that is not the same thing as saying, Mr. Downing, I think you should go out and get a neurological evaluation. You don't think a lawyer could make that connection when his expert says to him that there's an indication of an organic neurological basis for the behavior, that he has to say to him, and I think you better go get the test? Well, I think that the fact that that wasn't said, I think the natural thing for a hired expert to say would be, if this expert felt that neurological testing was warranted, I can't render a valid opinion until you get neurological testing. That was not said, and I think that even if Mr. Hernandez had some brain damage that affected his behavior, it begs the question, what is his behavior? Even if he had brain damage, this is a functioning individual for the reasons that Judge Nguyen pointed out with the detailed confession, with his calculating nature after the Ryan killing to cover up the crime, with his ability to commit two nearly identical crimes, to basically replicate both crimes. That evidence is planning. That evidence is somebody who is a functioning individual. Well, why did the state use its expert, this doctor who was later discredited and removed from the list, et cetera, et cetera, and so forth? Why would the state do that? I can't speak to that, Your Honor. I was not involved in the selection of that expert. You think the state behaved in a competent manner when they bring on an expert like that? Well, I mean, there's a lot of things that are cut different ways. You can argue from that that the state was looking for a conviction at all costs. I think that Dr. Martel, I'm sure that he had ample qualifications. Yes, the district court found him, gave his credibility little weight because of an incident that occurred, I think, with regarding taping a phone conversation. But I think whether or not the district court chose to believe Dr. Martel is certainly not determined. Oh, there was a lot more to them than what you're telling us, you know, than that. I'm sorry, I couldn't hear you, Your Honor. There was a lot more involved with Dr. Martel than you're relating to us. In my experience, I've never seen a situation with a government expert who was dealt with the way Martel was and was stricken from the list. And I think his medical license was taken away in that. There's a lot going on over there. Your Honor, the state's choice of an expert on federal habeas proceedings really says nothing to whether Mr. Hernandez is entitled to habeas corpus relief on the guilty verdicts for the death of these two young women. Even whether that was a poor choice of experts or not is really besides the point. Well, whatever it is, it was not the state's finest hour. Perhaps not. But the important points are what the experts said at the time of trial, which we are dealing with an ineffective assistance of trial counsel claim. Could trial counsel reasonably have relied on these experts in not putting on mental health evidence in support of a diminished capacity defense? These experts uniformly found that Mr. Hernandez was not psychotic. He was a sociopath. Even Dr. Gersh said that he manifested 12 of 15 signs of antisocial personality disorder, which is the classic criminal, somebody with no remorse, no conscience. And what I think is very important also is that before the trial actually started, Charles Downing gave both Dr. Maloney and Dr. Gersh additional information. Charles Downing had them review records from the Montessori school that Mr. Hernandez had attended. He had these experts review records from the clinic where Mr. Hernandez and his family received counseling while the family's attempt to adopt a second child was pending. And, in fact, the district court expressly found, sorry, I'm losing my voice, that Drs. Maloney and Gersh both knew that Mr. Hernandez had been referred for a neuropsychological examination at age 5, which is at age 5, that he had performed poorly on psychological tests as a young child, and that he had engaged in behavior suggesting psychiatric problems during his preschool years. The experts at the time of trial knew this, and the district court so found. That's on page 77 of the excerpts of record. What is also, I think, very important is the doctor's testimony. Dr. Maloney and Dr. Gersh testified under oath in the penalty phase. Nowhere did they say that they didn't have sufficient information to render a reliable opinion. Nowhere did they say they needed more data. In fact, Dr. Maloney testifies under oath in the penalty phase that he reviewed, quote, a multitude of records from various times in Mr. Hernandez's past. Nevertheless, he had no data to suggest that Mr. Hernandez would not be responsible for his behavior at the time of the offenses. Dr. Maloney opined. Well, did Maloney know the background of the adoptive parents and of the birth parents? And did he know about how this child was treated and how he was beaten and how he was hit on the head and that he suffered numerous head injuries and that his adoptive mother used to give him these enemas as a way of, I suppose, calming him down or pacifying him or punishing him? You know, that's like water torture. All these things went on. And the birth mother was a 14-year-old drug addict who was smoking and taking drugs while the child was in her uterus. They know all those things. Well, Your Honor, I think. And, I mean, it just goes on and on. And the father, the adoptive father was a very mean man, used to beat him a lot. Well, did he know that? I don't recall evidence of beatings by the father. Oh, yes. But I think that a lot of what Your Honor talks about really is material for the penalty phase, not a guilt phase when we're simply determining whether Mr. Hernandez has the capacity to form basic intents. All right, counsel, we're well over your time. May I just ask you the question I asked your opponent? I can easily foresee you being back here again in five years or ten years if things break a certain way. Is there anything to lose in your view by, number one, I'll give you Judge Preggerson's solution, that the two of you wonderful people go out together, sing Kumbaya, and resolve this case out in the hallway? The second question I would ask you is do you see anything to lose by involving our mediation process? Will you retain the right to reject any proposed solution, but going together with our mediator and spending a little time seeing whether you can resolve this problem so that we don't spend the next 10 or 20 years on it? Your Honor, that unfortunately is not my decision to make. It's up to the district attorney's office to decide whether to reseek the death penalty or not. I have no authority to settle this case. I certainly have no opposition to the idea, but it simply would not be within my purview to make. I am simply arguing the appeal. And you have a client like everybody else, and your ultimate answer depends on what your client does is willing to agree to. Sometimes it helps to bring a client to mediation, too. Well, our client is the warden, and, of course, he wouldn't have any meaningful input into this. But I think the bottom line, Your Honor, while I have no objection in concept to attempting to work anything out, really, to mediate, to come to some solution short of litigation or further litigation, it's just simply something that would have to be put to the district attorney's office. It's not within my authority to make any decisions along those lines. Well, nothing would have to be really put until we see whether there's any proposal that you think is a reasonable one to take back to your client. As far as I know, in fact, Ms. Cassadino and I actually touched on this before the argument. I think it was either Ms. Cassadino or Ms. Racone, her supervisor, mentioned the idea of possibly going back to the district attorney's office and saying, hey, if Mr. Hernandez waives his right to appeal, would you be willing to settle for a life without parole sentence? The problem why that never came to fruition was because Mr. Hernandez is insisting on his right to appeal the guilt phase. So it doesn't look like they're actually talking about this further. It doesn't look like Mr. Hernandez would be willing to do that. All right. Well, that's something we find out later when, if you go to mediation, the mediator points out all of these problems. You know, he may not ever be able to do it. Neither side may be willing, ultimately. Mr. Hernandez may well want to take the risk that he's going to be executed. The district attorney may want to take the risk that he's going to be out on the streets very quickly. But those are things that, you know, sometimes – Well, where is Hernandez today? I'm sorry, I couldn't hear you, Your Honor. Where is Hernandez today? As far as I know, Mr. Hernandez is still sitting on death row in San Quentin. Is he in a mental institution? No, he is not. He's at San Quentin State Prison. When is the last time you checked with San Quentin State Prison or with a warden, your client, to find out what his mental condition is as of the present time? Well, Your Honor, that wouldn't be questions that I would be asking. I think what's relevant is what Mr. Hernandez's mental condition was at the time of the crimes, not what his mental condition is after 30-some-odd years of being incarcerated. But, you know, you just don't understand what I'm trying to ask of you. I don't know. Maybe I'm not clearly communicating. Your Honor, I think what we're here to decide is whether the district court properly denied habeas relief as to the guilt phase. I think that clearly the district court reasonably found that there was no prejudice under Strickland. I've also made the argument that I think that there was also no deficient performance by counsel, and there's been the issue of whether a respondent had to take a cross appeal, and there was actually a U.S. Supreme Court case that came out a week ago regarding that issue. And I know I'm way over time, but indicated that a prevailing party does not have to take a cross appeal in order to defend a judgment on alternative grounds, but does have to take a cross appeal if it's making an argument designed to increase its own rights under the judgment or decrease its adversary's rights. And nothing that I've argued and nothing that... Well, it has to do with the fact that I've argued as an alternative basis to uphold the district court's judgment that trial counsel did not perform deficiently. You know, that is an interesting question that we're not here to decide today. You want to talk about, I gather from what you've just said, what we're here to decide today. We're not here to decide today what the effect of your waiver of the sentencing appeal is. That's not for us to do. Well, Your Honor... It's what the Supreme Court case will... what effect it will have on that argument. Should that argument arise in the state court, that's where it'll go first. As I said, it may well come back here after you go through the whole state court process again, if you have to. That may all come back to us someday. Well, Your Honor, how it comes into play here is that we've made arguments in connection with this appeal that challenging the district court's finding of deficient performance, the deficient performance strong of Prickland. No, you're challenging the conviction. You're not challenging the sentence. Correct. We've accepted Judge Liu's judgment. Mr. Hernandez is going to get a new penalty phase. The state has not appealed from that. All right. That's fine. Thank you. Thank you, Your Honors. Judge? Your Honors, I just wanted to clarify a few points, if I may. Mr. Lieberman raises the point that this evidence is really mitigation evidence that's relevant to penalty and not to guilt. Actually, that's just simply not true in the era of diminished capacity. As Mr. Lieberman read to you from the jury instruction, any abnormality, whether mental or physical, however caused, was relevant to a diminished capacity defense. When you look at the cases, it's relevant to diminished capacity. The question is, all the other evidence demonstrating capacity to form the requisite intent. That's what we have to weigh. Correct. Make a determination as to whether there's a substantial likelihood that you would have gotten a different result. I think you're arguing something you don't. I think Judge Wynn has said pretty much the same thing I have. We're discussing prejudice here, and the prejudice is going to be a matter of whether basically the confession, the evidence, whatever there is, it would show the intent is sufficient to rebut the four psychiatrists or whatever they are, mental health experts' testimony that he was not capable of forming the intent or that he didn't. And whether a jury presented with the evidence of the four medical experts will disbelieve their testimony and will think that the confession and the other conduct demonstrates to the contrary. That's what we have to decide in prejudice, and we have to decide whether there's a real probability, reasonable probability that the jury verdict would have been different, which means the lie is whether one juror would have agreed with the doctors rather than the state, or the county, I guess, when it presented the evidence of the confession, the interrogation, the evidence of the facts as they occurred, whether that outweighs the evidence offered by the defense in the form of the expert testimony. A jury confronted with all of that, would it have still reached the same verdict, or is there a reasonable probability that at least one juror would have reached a different verdict? And I think that's, unless somebody has a different view, is what the argument is today. I think that's exactly right, Your Honor. If I may just offer one additional point, and that is earlier with the Attorney General, you had been speaking about the similarity of the crimes, and I do want to point out that Mr. Hernandez's brain damage, there was opinion that it could result in ritualistic types of behavior, and I want to just highlight for the Court the fact that while it's remarkable how similar the crimes are, it's also remarkable... Wait, who said that, that it could result in ritualistic behavior? Dr. Gurr. Complex yet ritualistic behavior that might look intentional but is actually not subject to the executive function. That comes from Dr. Gurr's declaration. But I also just want to note, as remarkable as the similarities between the two crimes are, it is also remarkable how similar the injuries are to the type of injuries Mr. Hernandez sustained at the hands of his mother. And I think that goes to perhaps him repeating episodes from his childhood in moments where he's lacking control. And I just wanted to make that point, and I can sit down unless you have further questions. Well, no further questions. Thank you, Your Honor. Interesting arguments. I hope that you two will concentrate on the practicalities of this, where it's going to end up, how long it's going to take, what the results will be, and not just think about the legalistics of this case. It's been going on for a long time and may go on long after we're all here. Well, it'll go on, and I'll be someplace else watching you. Now, I just want to ask this question. Now, this defendant did spend time in mental institutions after he was sentenced. Am I correct on that? Your Honor, this is Ms. Cassadio for Petitioner. I'm actually unaware of the details of his incarceration soon after the crime. I could offer a 28-J letter on that point if you would like. Well, I mean, I'm pretty sure that he was. And I'm just asking that question, and if you don't know the answer, I know the answer. Okay. I did want to say that we would welcome a mediation order from the court and would diligently pursue settlement to the extent that that is feasible. Thank you, Cass. Yeah, and are you telling us that with the death penalty off the table, that life imprisonment without parole would be acceptable? Of course, Your Honor, we would have to go over the details with our client before I can. No, I'm asking if it would be acceptable to you. To me personally, yes. What is that? Yes, Your Honor. Okay, so that's the way you need to approach it, I think. But whatever you do, you know, remember they had a judge in L.A. that would give you nothing but advice and then lose the case for you. Which may have just happened. Okay. All right. Okay. Thank you all very much. The case to the target is under submission.
judges: Pregerson, Reinhardt, Nguyen